J-S05044-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN RE: ADOPTION OF: M.J.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.M.G., SR., NATURAL FATHER | : | |
| | : | No. 1647 WDA 2018 |

Appeal from the Order Entered October 12, 2018
in the Court of Common Pleas of Cambria County
Orphans' Court at No(s): 2017-0529 IVT

BEFORE:   PANELLA, P.J., NICHOLS, J. and STRASSBURGER*, J.

MEMORANDUM BY STRASSBURGER, J.:                    FILED APRIL 15, 2019

A.M.G., Sr. (Father), appeals from the order entered October 12, 2018, which terminated involuntarily his parental rights to his minor children, M.J.F., a female born in February 2014; A.M.G., Jr., a male born in April 2015; L.R.G., a female born in May 2016; and E.G., a male born in June 2017 (collectively, the Children).[1]  We affirm.

Cambria County Children and Youth Service (CYS) became involved with this family on June 17, 2015, after it received a report alleging child abuse with respect to A.M.G., Jr.  N.T., 9/24/2018, at 36.  The report alleged that Father and Mother brought A.M.G., Jr., to the hospital because of swelling in his leg.  Id.  Doctors performed x-rays on A.M.G., Jr., which

_____

* Retired Senior Judge assigned to the Superior Court.

[1] The order also terminated involuntarily the parental rights of the Children's mother, J.A.F. (Mother).  Mother did not appeal the termination of her parental rights, nor did she participate in this appeal.

revealed fourteen bone fractures throughout his body in various stages of healing. Id. Both parents acknowledged that they had been A.M.G., Jr.'s, only caretakers in the two months following his birth, but denied responsibility for his injuries. Id. They suggested instead that the fractures may have been the result of brittle bone disease (osteogenesis imperfecta). Id. However, tests conducted by A.M.G., Jr.'s, doctors ruled out this possibility. Id. at 15-17, 30-31, 36. That same day, Mother and Father agreed to a safety plan whereby M.J.F. and A.M.G., Jr., would be placed in the custody of a relative while CYS conducted its investigation into the report of alleged abuse. Id. at 37; CYS Exhibit 8. The juvenile court adjudicated M.J.F. and A.M.G., Jr., dependent on December 7, 2015. N.T., 9/24/2018, at 38. In the adjudication order, the court found A.M.G., Jr., had been the victim of child abuse.[2] Id. at 44-45.

_____

[2] The juvenile court did not identify the perpetrator of the abuse in its order. See CYS Exhibit 9 (dependency pleadings and orders). According to the CYS caseworker, the court made a finding of abuse "without a perpetrator" because it "wanted the criminal process to work its way up." N.T., 9/24/2018, at 44. By way of background, Father incurred criminal charges due to A.M.G., Jr.'s, injuries. Id. at 49. He was arrested in April 2017 and released on bail seven and a half months later in approximately December 2017. CYS Exhibit 8 (Family Service Plan and Child Permanency Plan Review documents); N.T., 9/24/2018, at 97. Father pleaded nolo contendere to aggravated assault and received a sentence of 6 to 36 months of incarceration on June 27, 2018. CYS Exhibit 11 (documents relating to Father's criminal charges). He received credit for time served and was granted immediate parole. Id.; N.T., 9/24/2018, at 97. The caseworker testified that CYS updated its system with information regarding Father's plea and that he is now a founded perpetrator of abuse. N.T., 9/24/2018, at 44-45, 71-72. Father did not appeal the founded report.

Subsequently, as noted above, Mother gave birth to L.R.G. in May 2016. CYS obtained protective custody of L.R.G. the day after her birth and placed her in foster care directly from the hospital. Id. at 38; CYS Exhibit 9. The juvenile court held a shelter care hearing two days later and adjudicated L.R.G. dependent that same month. N.T., 9/24/2018, at 41. On March 15, 2017, the court changed the permanent placement goals of M.J.F., A.M.G., Jr., and L.R.G. from reunification to adoption. Id. at 48. In June 2017, Mother gave birth to E.G. Once again, CYS obtained protective custody of E.G. and placed him in foster care directly from the hospital. Id. at 38; CYS Exhibit 9. The court held a shelter care hearing two days after E.G.'s birth and adjudicated him dependent later that month. CYS Exhibit 9. The court set E.G.'s goal as adoption at the time of his adjudication. N.T., 9/24/2018, at 48.

On June 5, 2017, CYS filed petitions to terminate Father's parental rights to M.J.F., A.M.G., Jr., and L.R.G. involuntarily. On August 25, 2017, CYS filed a petition to terminate Father's parental rights to E.G. involuntarily. CYS filed amended petitions as to each child on January 8, 2018. The orphans' court conducted a hearing on September 24, 2018.[3] At

_____

[3] The orphans' court appointed a single legal counsel to represent the Children during the termination hearing. The record indicates that counsel also served as the Children's guardian ad litem. See N.T., 9/24/2018, at 8 (discussion by the court and counsel regarding whether counsel could represent both the Children's legal and best interests without conflict). Counsel spoke to the Children together and then interviewed each of the
(Footnote Continued Next Page)

that hearing, CYS presented the testimony of Dr. Jennifer Wolford, D.O., among others. Dr. Wolford was an attending physician in the Child Advocacy division at Children's Hospital of Pittsburgh, and she examined A.M.G., Jr., on June 18, 2015. Following the hearing, on October 12, 2018, the court entered an order terminating Father's rights with respect to the Children. Father timely filed a notice of appeal on October 24, 2018.[4] He

(Footnote Continued) ——————————

Children separately and provided the court with a thorough description of those interviews and the Children's statements. Id. at 4-8. Specifically, M.J.F., age four, understood the relationships of Mother, Father, and her foster parents. She stated that she wanted to stay where she was with her siblings, but that she would still like to see Mother and Father once in awhile. Id. at 4, 6-7. A.M.G., Jr., age three, relayed that he wanted to continue living where he was living. Id. at 4-5. L.R.G., age two, did not say much, kept asking for "daddy" in reference to foster father, and stated that she was happy living with foster parents, who she referred to as mommy and daddy, and her siblings. Id. at 4-5. E.G., age 15 months, was nonverbal. Id. at 4. Based upon those interviews and a review of the CYS record, counsel determined that the Children's best interests and legal interests "coincide perfectly." Id. at 8. As such, counsel assured the court that there was no conflict between the Children's best and legal interests, and counsel could represent both without conflict. Id. at 8. Ultimately, counsel argued that it would be in the legal and best interests of the Children to terminate Father's parental rights and argued in support of that outcome. Id. at 119-22. He also filed a brief supporting termination on appeal.

[4] By filing a single notice of appeal from the order terminating his parental rights to all four Children, Father violated our Rules of Appellate Procedure. See Pa.R.A.P. 341, Note ("Where … one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed."); Commonwealth v. Walker, 185 A.3d 969, 977 (Pa. 2018) (holding that the failure to file separate notices of appeal from an order resolving issues on more than one docket "requires the appellate court to quash the appeal"). On November 21, 2018, this Court issued an order directing Father to show cause why his appeal should not be quashed. Father complied by filing a response on November

(Footnote Continued Next Page)

filed a concise statement of errors complained of on appeal on October 26, 2018.[5]

Father now raises the following claims for our review.

> 1. Whether the [orphans' c]ourt erred in terminating [Father's] parental rights to the [C]hildren, because [CYS] failed to meet [its] burden by clear and convincing evidence, including, but not limited to failing to identify how termination of [Father's] parental rights would impact the [C]hildren, in particular, the bond between [Father] and the [C]hildren[?]
>
> 2. Whether the [orphans' c]ourt erred in failing to appoint an expert for [Father] to counter [CYS's] expert regarding the cause of [A.M.G., Jr.'s,] broken bones[?]

Father's Brief at 4 (suggested answers omitted).

(Footnote Continued) ————————————

30, 2018, along with timestamped copies of four amended notices of appeal, which he filed in the orphans' court on November 26, 2018. Father did not include amended concise statements of errors complained of on appeal.

In a recent case, a panel of this Court declined to quash an involuntary termination appeal based on noncompliance with Rule 341, recognizing the possibility that "decisional law may have been unclear to this point[.]" In the Matter of: M.P., ___ A.3d ___, 2019 WL 850581 at *2 (Pa. Super. filed Feb. 22, 2019). However, the panel announced that this Court would quash any noncompliant appeals filed after the date of its decision on February 22, 2019. Id. at *7. Because Father filed his notice of appeal well in advance of our Court's decision in M.P., we likewise decline to quash the instant appeal.

[5] Father violated Pa.R.A.P. 1925(a)(2)(i) by failing to file a concise statement at the same time as his notice of appeal. We have accepted Father's concise statement filed two days late pursuant to In re K.T.E.L., 983 A.2d 745, 748 (Pa. Super. 2009) (holding that the appellant's failure to comply strictly with Pa.R.A.P. 1925(a)(2)(i) did not warrant waiver of her claims, as there was no prejudice to any party).

We address both of Father's claims together, as they are interrelated.

In doing so, we apply the following standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. See 23 Pa.C.S. § 2511. It requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [subs]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [subs]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In the instant matter, the orphans' court terminated Father's parental rights to the Children pursuant to subsections 2511(a)(1), (2), (5), (8), and

(b).[6]  We need only agree with the court as to any one subsection of 2511(a), as well as subsection 2511(b), to affirm.  In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004) (en banc).  Here, we analyze the court's decision pursuant to subsections 2511(a)(2) and (b), which provide as follows.

> (a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> (b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.
>
> ***

_____

[6] We note that CYS filed its petitions pursuant to subsections 2511(a)(1), (2), (5), (8), and (b), with respect to M.J.F., A.M.G., Jr., and L.R.G.  CYS filed its petition with respect to E.G. pursuant to subsection 2511(a)(2) and (b).

23 Pa.C.S. § 2511(a)(2), (b).

We consider first whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to subsection 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

In re Adoption of M.E.P., 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." In re A.L.D., 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

In its findings of fact accompanying the order on appeal, the orphans' court found that CYS met its burden of proving Father's parental incapacity due to abuse and neglect. Order, 10/12/2018, at ¶¶ 26-27. The court placed particular emphasis on the Children's health, safety, and welfare. Id. at ¶ 27. It agreed with CYS that the Children would be at risk of abuse or neglect if they were to return to Father's care and that there were no services available capable of remedying this problem. Id.

In response, Father argues that the orphans' court erred because CYS did not present any "mental health reports regarding [his] ability to parent," and because he complied with nearly all of his reunification goals. Father's

Brief at 13-14.  Father maintains that the only goal he failed to comply with was admitting responsibility for A.M.G., Jr.'s, injuries.  Id. at 13-14, 25.  He also asserts that he is indigent and that the court erred by failing to appoint an expert on his behalf to "counter [CYS's] expert witness regarding the cause of [A.M.G., Jr.'s,] broken bones."  Id. at 13, 26-27.

At the outset, Father waived any claim that the orphan's court erred by terminating his parental rights without the benefit of mental health reports addressing his ability to parent because Father failed to develop this claim in his brief.  In re M.Z.T.M.W., 163 A.3d 462, 465 (Pa. Super. 2017) ("It is well-settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority.").  Father's argument on this point consists of a single sentence with no citation to relevant legal authority.[7]  See Father's Brief at 13.

Similarly, Father waived any claim that the orphans' court erred by failing to appoint an expert witness to counter the opinions of Dr. Wolford by failing to support it in his brief on appeal with citations to relevant legal authority.  See M.Z.T.M.W., 163 A.3d at 465.  Indeed, Father appears to concede that there is no legal authority requiring that an orphans' court

_____

[7] Even if he had preserved this claim for our review, it would be meritless, as there is no requirement in our law that a court must have the benefit of mental health reports before terminating parental rights.  Moreover, Father has not appealed the founded abuse finding based upon his conviction.

appoint an expert to refute the opinions of an expert presented by CYS. See Father's Brief at 26 (characterizing this issue as a "matter of first impression").

Father also waived this claim by failing to raise it before the orphans' court in a timely manner. See State Farm Mut. Auto. Ins. Co. v. Dill, 108 A.3d 882, 885 (Pa. Super. 2015) (quoting Lockley v. CSX Transp. Inc., 66 A.3d 322, 325 (Pa. Super. 2013)) ("'It is axiomatic that [i]n order to preserve an issue for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court. Failure to timely object to a basic and fundamental error will result in waiver of that issue.'"). The record reveals that Father waited to raise this claim until the last possible moment by bringing it to the court's attention in chambers immediately before the termination hearing. N.T., 9/24/2018, at 113.

Specifically, Father's counsel requested additional genetic testing, explaining that Father "was going to provide me with a list of ... experts in this field. Unfortunately, I never received that list. He was to fax it to me. I wanted to be able to present to the [c]ourt names and possible costs and so forth." Id. at 114. The orphans' court deferred making a decision to allow counsel ten days to present to the court "some type of evidence to warrant having any further testing done" on A.M.G., Jr. Id. at 115. The court entered an order on September 26, 2018, giving Father until noon on October 3, 2018, to provide "specific information to warrant additional

testing of A.M.G., Jr., to refute the findings of Children's Hospital of Pittsburgh that the child does not have osteogenesis imperfecta." Order, 9/26/2018.

In a letter dated October 4, 2018, Father's counsel wrote to the orphans' court explaining that he had been "unsuccessful in retaining an expert[.]" Court's Exhibit 1. Curiously, however, the record also contains the curriculum vitae of William E. Hauda, II, M.D. See id. In its brief, CYS indicates that Father's counsel submitted the curriculum vitae the following day, on October 5, 2018. CYS's Brief at 19. The orphans' court states that it received the curriculum vitae from Mother's counsel "several days after the hearing … with a request to have that person retest the child for [o]steogenesis, or brittle bone disease, representing that [M]other had had such a disease." Order, 10/12/2018, at ¶ 25. The court rejected the request for retesting, offering the following explanation.

> A. No medical evidence was presented to show [M]other had such a disease or condition.
>
> B. The child was tested at a world-renown[ed] medical facility with negative results for such a disease or condition.
>
> C. [Dr. Wolford] testified to a reasonable degree of medical certainty that the child had been the victim of physical abuse.
>
> D. Since the removal of the child from [Mother's and Father's] care and custody, [when he was] two months old, he had gained weight and suffered no more fractures.
>
> E. The curriculum vitae submitted to the [c]ourt, after careful review, does not indicate that the proposed professor has any

experience in evaluating a child with [o]steogenesis, or brittle bone disease.

Id. (citation to the record omitted).

Upon review, we discern no abuse of discretion by the orphans' court. Father had every opportunity to locate and present the court with an expert to refute the testimony of Dr. Wolford. To the extent he failed to do so until after the October 3, 2018 deadline, the court was under no obligation to delay its termination decision any longer. However, even if Father presented the court with Dr. Hauda's curriculum vitae prior to the deadline, we agree with the court that based on his curriculum vitae, Dr. Hauda does not appear to have any expertise in diagnosing brittle bone disease. Moreover, the evidence in this case, including the testimony of Dr. Wolford, a prior finding of child abuse with unknown perpetrator, a founded abuse finding against Father, Father's criminal conviction, and the fact that A.M.G., Jr., has not suffered any additional bone fractures since leaving Father's care, points overwhelmingly to the conclusion that A.M.G., Jr., does not suffer from brittle bone disease. Father is not entitled to relief.[8]

_____

[8] Father describes Dr. Wolford as "CYS's expert who was also compensated by the taxpayers." Father's Brief at 27. As explained above, Dr. Wolford was a physician at Children's Hospital of Pittsburgh who examined A.M.G., Jr. We see no indication in the record that Dr. Wolford received public funds for her testimony. The orphans' court did not appoint Dr. Wolford to testify on CYS's behalf, and it appears that CYS called her to testify just as it would any other witness.

Turning to the merits of Father's remaining claims, we note that Father's concise statement and statement of questions presented do not raise a claim that CYS failed to prove grounds for termination. Accordingly, Father has waived any argument in that regard. However, even if not waived, the record supports the conclusion of the orphans' court that CYS presented clear and convincing evidence to justify termination of Father's parental rights. During the hearing, CYS presented the testimony of Dr. Wolford. N.T., 9/24/2018, at 10-11. She testified that A.M.G., Jr., presented with three fractures in his left leg, three fractures in his right leg, one fracture in his left arm, one fracture in his right arm, and five fractures in his ribs. Id. at 12-13. The fractures appeared to be different ages, as they were in different stages of healing. Id. at 14-15. Dr. Wolford opined that the fractures would likely have caused A.M.G., Jr., "extraordinary pain[,]" making him unable to eat, gain weight, and develop his brain as he should have been. Id. at 19. She further testified to the outward signs that would have alerted a parent to his injuries: swelling of the limbs around the fractures, difficulty being picked up, exceptional fussiness, crying, difficult to control, and not eating well. Id. at 26-28. According to Dr. Wolford, "[i]t is nearly impossible for [her] to conceive that a reasonable adult caretaker would not recognize that there was something wrong with [A.M.G., Jr.,] that he needed to be further evaluated." Id. at 28.

Critically, Dr. Wolford rejected the possibility that A.M.G., Jr.'s, injuries resulted from birth trauma, routine care by a reasonable adult, or any other

natural cause suggested by Mother and Father. Id. at 15. She testified that genetic specialists at the hospital examined A.M.G., Jr., and that he underwent further testing, which confirmed that he does not suffer from a bone disease. Id. a 15, 30-31. She explained, A.M.G., Jr., "had multiple lab tests done including checking his Vitamin D levels because he had a hard time feeding in the beginning. Those were normal. His calcium was normal. His parathyroid test was normal. And his phosphorous were all normal. Further, genetic testing for osteogenesis imperfecta, which some people call brittle bone disease, came back negative or normal." Id. at 16-17. Dr. Wolford added that A.M.G., Jr., has not suffered any bone fractures since CYS removed him from his parents' care, and that the hospital conducted subsequent x-rays, which revealed he was healing normally and had "good, normal bones." Id. at 21, 29. Ultimately, she opined that A.M.G., Jr., was "the victim of extraordinary physical abuse on multiple occasions in the first two months of his life[.]" Id. at 17. Notably, both Mother and Father stated that they had been A.M.G., Jr.'s, sole caretakers during that timeframe.[9] Id. at 36.

_____

[9] Following Father's nolo contendere plea, he was designated a founded perpetrator of child abuse. Id. at 44-45, 71-72. We note that while a nolo contendere plea may serve as a basis for a founded report of abuse, 23 Pa.C.S. § 6303, a plea of nolo contendere is not an admission to the underlying conduct. See Commonwealth v. V.G., 9 A.3d 222, 226 (Pa. Super. 2010) (noting that by entering a nolo contendere plea, a defendant does not admit guilt, and such a plea "has no effect beyond the particular case") (citations omitted). Therefore, we do not consider Father's plea in
(Footnote Continued Next Page)

The record also belies Father's contentions regarding compliance with his reunification goals. CYS caseworker, Stephen Nelson, testified that these goals included undergoing a psychological evaluation, completing a parenting program, taking his medication, participating in mental health treatment regularly, maintaining a stable and clean home, and providing a reasonable explanation for A.M.G., Jr.'s, injuries. Id. at 40-41.

Concerning compliance with these goals, Mr. Nelson testified that Father participated in a parenting program. Id. at 47, 63. Father also underwent a psychological evaluation and began treatment at a psychiatric center. Id. at 42. However, he failed to take his medication consistently and failed to maintain a stable and clean home. Id. at 45, 63. Mr. Nelson reported that Father's home contained "pockets of clutter. The house smelled like animal urine.... They had boxes on top of each other that if one of the younger kids would have pulled on a box it would have fell [sic] on them [sic]." Id. at 45. Father cleaned his home once at Mr. Nelson's request, but only to the extent that it would have been appropriate "for when children would not be present." Id. at 64. The situation remained unresolved until Father's incarceration caused him to lose the home. Id. at 45.

(Footnote Continued) ————————————

determining whether CYS presented clear and convincing evidence to justify termination of his parental rights.

Mr. Nelson further testified that Father committed an act of domestic violence against Mother in December 2016, which resulted in her receiving "a busted lip and red marks on her face." Id. at 46. Father fled the scene and later received additional criminal charges. Id. He "end[ed] up having suicidal ideations and was then taken to Clarion Psych[.]" Id. Father conceded that he pleaded guilty to two summary offenses because of this incident. Id. at 105.

Accordingly, the record is clear that Father is incapable of parenting the Children safely, and that he cannot or will not remedy his parental incapacity pursuant to subsection 2511(a)(2). The record demonstrates that while in the sole care of Mother and Father for two months, A.M.G., Jr., suffered severe injuries, which indicates that Father either knew about the injuries and failed to protect A.M.G., Jr., or inflicted the injuries himself. Contrary to his argument on appeal, Father failed to comply with his other reunification goals as well, by failing to take his medication consistently and by failing to maintain a stable and clean home. Father's December 2016 act of domestic violence against Mother further illustrates his incapacity to parent due to his violent behavior. As this Court has emphasized, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." In re Adoption of R.J.S., 901 A.2d 502, 513 (Pa. Super. 2006).

We consider next whether the orphans' court abused its discretion by terminating Father's parental rights to the Children involuntarily pursuant to subsection 2511(b). The requisite analysis is as follows.

> [Subs]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [subs]ection 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

In re Adoption of C.D.R., 111 A.3d 1212, 1219 (Pa. Super. 2015) (quotation marks and citations omitted).

In the instant matter, the orphans' court found that terminating Father's parental rights would best serve the Children's needs and welfare. Order, 10/12/2018, at ¶ 28. The court reasoned that it did not require a bonding evaluation to reach this conclusion, given the young ages of the Children at the time they entered foster care. Id.

- 17 -

Father challenges the finding of the orphans' court, arguing that CYS failed to identify how the termination of his parental rights would affect the Children. Father's Brief at 13-14, 23-25. He asserts that he and the Children share a bond and criticizes the court for terminating his parental rights without the benefit of "mental health reports" addressing the existence of this bond. Id.

We once again discern no abuse of discretion. It is beyond cavil that an orphans' court may conduct a subsection 2511(b) analysis without the benefit of "mental health reports." See In re Z.P., 994 A.2d 1108 (Pa. Super. 2010) (citations omitted) ("When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well."). In the instant case, Mr. Nelson testified as to Father's relationship with each of the Children. Mr. Nelson opined that M.J.F., age four, displays "somewhat of a bond" with Father. N.T., 9/24/2018, at 53, 57, 68. M.J.F. greets Father and interacts with him, and their visits together are positive. Id. at 53. However, Mr. Nelson believed that M.J.F.'s bond with Father has weakened due to the length of time she has been out of his care. Id. He opined that A.M.G., Jr.'s, bond with Father is even weaker. Id. at 57. A.M.G., Jr., knows who Father is, but has not lived with Father since he was two months old, and their bond is not a parent-child bond. Id. at 57-58. As for L.R.G., Mr. Nelson testified that she has never lived with Father and has had little contact with him due to his incarceration. Id. at 54. While L.R.G. also knows who Father is, their

bond is similarly not a parent-child bond. Id. He described the bond instead as being equivalent to "a relative. An uncle. Somebody you see." Id. Finally, Mr. Nelson opined that E.G. does not share a bond with Father at all, because he never lived with Father and has had even less contact with him than L.R.G. Id. at 59.

Significantly, Mr. Nelson testified that the Children are doing well in foster care and are bonding with their pre-adoptive foster family. Id. at 51-53, 55-56, 58. As to the Children's position, the Children's legal counsel argued for termination of parental rights in part because the Children are doing well in foster care and appear to have bonded with their pre-adoptive foster family. Specifically, counsel argued that while E.G. is not yet verbal, the three older children refer to their foster parents as "Mommy and Daddy." Id. at 4-6. During counsel's interview with M.J.F., she stated that she wants to live with her foster parents and that she would like to see Father "once in a while maybe." Id. at 6-7. A.M.G., Jr., stated that he "wants to continue living where he's living and ... he wants his foster parents to be -- and this is a direct quote -- my mommy and daddy forever." Id. at 5. Finally, L.R.G. "kept asking for Daddy, who was the foster father, who was sitting out in the waiting room with the other kids." Id. Counsel reported that the Children gravitated toward their foster father, and appeared to have bonded with him in a remarkably short period of time, some within a matter of weeks. Id. at 121. As such, counsel argued that termination of parental rights was in the Children's legal and best interests.

Thus, the record confirms that it would best serve the needs and welfare of the Children to terminate Father's parental rights involuntarily pursuant to subsection 2511(b). The three younger children, A.M.G., Jr., L.R.G., and E.G., do not share a parent-child bond with Father. While M.J.F. appears to share a more significant bond with Father than her siblings, this bond has weakened over time and the record indicates that severing it will not cause her to suffer severe or irreparable emotional harm. The Children have developed a positive relationship with their foster parents and all three of the older children have expressed a desire to remain in the foster home. Adoption by the foster parents will allow the Children to remain together and obtain permanence and stability. See T.S.M., 71 A.3d at 269 (stressing the need to expedite the placement of dependent children "in permanent, safe, stable, and loving homes").

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion by terminating Father's parental rights to the Children involuntarily. Therefore, we affirm the court's October 12, 2018 order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/15/2019

- 20 -